**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

UNITED STATES OF AMERICA,

        v.

ARAFAT NAGI,

        Defendant.
_____

15-CR-148-A
**DECISION AND ORDER**

The Defendant, Arafat Nagi, is charged with two counts of attempting to provide material support to the Islamic State of Iraq and the Levant (ISIL),[1] a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1).

The Defendant moves to dismiss the indictment, arguing that the conduct charged—in effect, attempting to join ISIL—is protected by the First Amendment. He also moves to suppress evidence recovered from searches of his home and his email account. Finally, he moves for a bill of particulars.

Magistrate Judge Scott, to whom the Court referred this case for all pretrial matters, recommends denying the Defendant's motion to dismiss, as well as his motions to suppress. Judge Scott also granted in part the Defendant's motion for a bill of particulars. The Defendant has objected to Judge Scott's recommendations, and the Government has appealed Judge Scott's order directing particularization.

For the reasons stated below, the Court adopts Judge Scott's recommendations to deny the Defendant's motions to dismiss and to suppress. The Court also vacates Judge Scott's order directing particularization.

---

[1] ISIL is identified by several names throughout the record, such as the Islamic State of Iraq and Syria (ISIS) and the Islamic State. To avoid confusion, the Court refers to the organization only as ISIL.

## BACKGROUND[2]

The Defendant is an American citizen who, before his arrest, lived in Lackawanna, New York. The allegations in this case are centered on two trips the Defendant took to Turkey in 2012 and 2014. The complaint alleges that the Defendant took these trips not for the purpose of vacationing or visiting family but, instead, with the intent of entering Syria and joining ISIL.

The Defendant made his first trip to Turkey in October 2012. Docket No. 2 (Complaint) ¶ 14. The Defendant booked a three-month trip to Turkey and Yemen (where the Defendant has family), but his trip lasted only one day; after arriving in Turkey, the Defendant returned to the United States when his gallbladder "almost burst." *Id.* ¶¶ 14, 16. The complaint suggests, however, that, had the Defendant continued his trip, Yemen would not have been his final destination. Rather, a message from the Defendant's cousin (sent nearly one year after the Defendant returned to the United States) asked the Defendant "[h]ow was Syria and turkey?" *Id.* ¶ 16. The Defendant responded that he had had to return to the United States on an emergency flight. *Id.* The Defendant's cousin then asked him why he "keep[s] going to the Middle East with all these wars going on," to which the Defendant responded: "I'm good not worried I wanted help the Syrian people I feel for them walla my heart bleeds for them." *Id.* ¶ 17.

The Defendant made his second trip to Turkey on July 24, 2014. *Id.* ¶ 12. The complaint alleges that, several days after he arrived, the Defendant sent a message to his sister using a cell phone app. The Defendant's sister asked: "Well did you make it

---

[2] The facts that follow are drawn from the affidavit submitted in support of the criminal complaint in this case. *See* Docket No. 2.

. . . Like with them or wat . . . Yeah right, you hanging with them now . . . I was really spectacle [sic] so was found cuz you weren't sure so you finally with them . . . . I don't believe you with them." *Id.* ¶ 34 (ellipses in complaint). The Defendant responded that he was "talking with them for the first time . . . No not yet they are a fee [sic] hours away from me . . . They gave me directions how to get to them . . . But because of eid today there are no buses." *Id.* ¶ 35. The Defendant's sister then told the Defendant that his brother "said u coming back u went on vacation you not getting in." *Id.* ¶ 36. The Defendant responded that "I'm only a few hours away from there . . . I wouldn't waste money I don't have for a vacation I'm not careless with money like [the Defendant's brother]." *Id.* The complaint contends that these conversations show that the Defendant traveled to Turkey with the goal of entering Syria and joining ISIL. *Id.* ¶ 37.

The complaint also alleges that, the day after he spoke with his sister, the Defendant spoke with his son. Specifically, the complaint alleges that the Defendant sent his son a message stating that "I talked them personally [sic] . . . Yea I leave Tuesday to meet my friends because of eid everything is closed no buses . . . In sha Allah we started joking with each other already and my other friends told me they are trustworthy." *Id.* ¶ 38. The Defendant's son responded: "Eid Mubarak. In sha Allah Allah will grant you your destiny and make it easy for you." *Id.* The complaint again alleges that this message shows that the Defendant's purpose in traveling to Turkey was to enter Syria and join ISIL.

After obtaining search warrants for the Defendant's personal electronic devices, the Government "discovered records of internet searches and cached images, executed and captured during . . . [the Defendant's] 10 day stay in Istanbul" in 2014. *Id.* ¶ 40. In

particular, on the Defendant's iPad the Government located screen captures showing a search, on the website booking.com, for a three-day stay in Iskenderun, Turkey, from August 5, 2014 to August 8, 2014. *Id.* ¶ 41. The Defendant also searched for travel information from Istanbul to Hatay Province (the Turkish province in which Iskenderun is located, *id.* n.9). Hatay Province, the complaint states, "has become a pivotal location in the conflict in Syria due to its geography and demography." *Id.*

The complaint alleges that these activities show that the Defendant did not intend to vacation in Turkey for ten days before traveling to Yemen. Rather, the complaint alleges, these facts show that the Defendant traveled to Turkey with the goal of entering Syria and joining ISIL. For instance, the complaint alleges, the Defendant researched travel to Iskenderun for dates *after* he had planned to travel to Yemen; he booked his trip from the United States to Yemen as a single trip; and Iskenderun is an approximate 80-minute drive from the Syrian border. *Id.* ¶ 43 & n.9. The complaint alleges that this activity is consistent with that of someone seeking to disguise his travel to Syria with what appears to be legitimate travel: According to the complaint, "individuals aspiring to join ISIL in Syria are counseled to book tickets with alternate destinations and layovers in strategic locations/countries in order to hide the true nature of their travel, with no intent to fully complete the final leg of the journey." *Id.* ¶ 43. Finally, the complaint alleges that the Defendant viewed ISIL-associated content—including ISIL-controlled border crossing—on his iPad while he was researching travel to Iskenderun. *Id.* ¶¶ 45, 46.

While he was in Turkey, the Defendant also researched the Turkish National Intelligence Organization. *Id.* ¶ 47. The Government alleges that, after returning to the

United States, the Defendant told an associate that, while he was in Istanbul, he believed he was being followed by "an intelligence agency." *Id.* ¶ 47. The complaint contends that this "may" be the reason why the Defendant did not actually enter Syria during his 2014 trip. *Id.* Rather, on August 4, 2014, ten days after arriving in Turkey, the Defendant traveled to Yemen. *Id.* ¶ 16.

The Defendant returned to the United States on September 19, 2014. Upon his arrival, the Defendant informed Customs and Border Protection (CBP) officers that he had traveled to Istanbul for a ten-day vacation "to get away from family"; that he had then continued on to Yemen to visit an uncle; and that he does not support ISIL, Al Qaeda, Al Qaeda on the Arabian Peninsula, or other mujahedeen groups. *Id.* ¶ 13.

After his return to the United States, the complaint alleges that the Defendant had several conversations with an unnamed associate. Specifically, the complaint alleges that the Defendant told his associate that he was angry about the killing of rebels in Yemen; that he believed the United States was responsible for those killings; that he had pledged an oath of allegiance to Abu Bakr al-Baghdadi, the self-proclaimed Caliph of the Islamic State; that he agreed with ISIL's tactics, such as killing innocent men, women, and children, "believing that [such acts] were justified because the victims were not Muslim"; that he believed it was permissible for ISIL to burn a captured Jordanian pilot; and that, in 2015, he intended to return to Yemen, travel from Yemen to Turkey, and then travel from Turkey to Syria. *Id.* ¶¶ 49-52.

Finally, the complaint details the Defendant's Internet activity from August 2012 until September 2014.[3]

First, the Government alleges that, from 2012 through 2013, the Defendant purchased numerous pieces of combat gear from eBay, such as a tactical vest with armor plates, combat boots, camouflage clothing, a Shahada flag,[4] Kevlar "Hard Knuckle Tactical Gloves," a "Military Style Outdoor Mountaineering Backpack," a machete, a burn kit, and night-vision goggles. *Id.* ¶19.

Second, the complaint details Tweets and retweets found on the Defendant's Twitter account. For instance, prior to his 2014 trip to Turkey, the Defendant tweeted his "pledge to hear and obey Abu Bakr al-Baghdadi." *Id.* ¶ 22. The Defendant also tweeted, among other things, ISIL-related YouTube videos, messages promoting ISIL, photos of dead Islamic State soldiers, photos of individuals being beheaded, and photos of severed heads. *Id.* ¶¶ 22-29. Many of these Tweets were accompanied by text, such as, "Oh, you who are defaming the Islamic State, its soldiers shall be present at time of death. Those who have brains ought think & learn"; and "God is the Greatest. The three heads, those who dug their graves by their own hands." *Id.* ¶¶ 25, 28. The complaint also alleges that the Defendant followed a number of Twitter handles "that featured profile pictures of ISIL flags, photos of al-Baghdadi or Osama bin Laden, photos of weapons or of individuals in military fatigues, photos of recent beheadings, or

---

[3]  The complaint alleges that the Defendant deactivated his Twitter account as of September 25, 2014, several days after he returned to the United States and was questioned by CPB officers about whether he supported ISIL. *Id.* ¶ 30.

[4]  The complaint states that the Shahada flag is "a black flag typically showing the Islamic creed or 'shahada' in white script, expressing 'There is no god but Allah, and Muhummad is his messenger.'" *Id.* at 8 n.3. The complaint further states that, "[a]lthough not inherently associated with violent jihad, the flag has been known to be commonly adopted for use by jihadists and Islamic terrorist organizations around the world," such as ISIL. *Id.*

other images which could reasonably be described as violent or terrorism-related in nature." *Id.* ¶ 23.

The Defendant was arrested on a criminal complaint in July 2015. A grand jury then handed an indictment charging him with two counts of attempting to provide material support to ISIL, in violation of 18 U.S.C. § 2239B(a)(1). During proceedings before Judge Scott, the Government produced what both the Government and the Defendant characterize as "voluminous" discovery. *See* Docket No. 55 at 2; Docket No. 53 ¶ 3. For instance, the Government produced a record of the Defendant's Twitter page; a record of his eBay purchases; a copy of his Gmail account; evidence from the Defendant's relative's house; evidence recovered from a number of the Defendant's electronic devices; affidavits in support of the search warrants in this case; and text messages between the Defendant and a family member. Docket No. 55 at 2-3.

As relevant here, in proceedings before Judge Scott the Defendant moved to dismiss the indictment on First Amendment grounds. He also moved to suppress evidence recovered from searches of both 151 Olcott St., Lackawanna, New York, and his Gmail account. Finally, the Defendant moved for a bill of particulars.

Judge Scott recommends denying the Defendant's motions to dismiss and to suppress. Judge Scott also granted in part the Defendant's motion for a bill of particulars. Specifically, Judge Scott ordered the Government to particularize "the conduct and or statements manifesting defendant's intent to assist ISIS; [and] the overt act(s) that constitute substantial step(s) toward completion of the offense of providing material assistance to a foreign terrorist organization." Docket No. 37 at 19.

The Defendant objects to Judge Scott's recommendations to deny his motions to dismiss and to suppress, and the Government appeals Judge Scott's order directing the Government to particularize the charges in the indictment. The Court reviews Judge Scott's recommendations as to the Defendant's motions to dismiss and to suppress *de novo*. 28 U.S.C. § 636(b)(1). The Court reviews Judge Scott's order granting a bill of particulars to determine whether the order is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A).

## DISCUSSION

### 1. Motion to dismiss

The Defendant first moves to dismiss the indictment on First Amendment grounds. The Defendant argues that, given the nature of the "support" he is alleged to have attempted to provide to ISIL—that is, himself—the indictment charges him only with engaging in conduct that is protected by First Amendment, such as associating with, or attempting to join, a foreign terrorist organization.

The Defendant is charged with violating 18 U.S.C. § 2339B(a)(1). Section 2339B "is, on its face, a preventative measure—it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010). To that end, the statute makes it a crime to "knowingly provide[] material support or resources to a foreign terrorist organization, or attempt[] or conspire[] to do so." 18 U.S.C. § 2339B(a)(1). To obtain a conviction under § 2339B(a)(1), the Government must also prove that a person "ha[d] knowledge that the organization is a designated terrorist organization . . ., that the organization has

engaged or engages in terrorist activity . . ., or that the organization has engaged or engages in terrorism." *Id.*

The indictment charges that the Defendant attempted to provide "material support" to ISIL in the form of "personnel"—that is, himself. Section 2339B's definition of the term "material support" includes "personnel," and the provision of "personnel" "may be or include" the provision of "oneself" to a foreign terrorist organization. 18 U.S.C. §§ 2339B(g)(4), 2339A(b)(1). In such a case, however, § 2339B requires the Government to also prove a connection between a defendant and a foreign terrorist organization: The statute provides that "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objects shall not be considered to be working under the foreign terrorist organization's direction and control." 18 U.S.C. § 2339B(h).

When a defendant is charged with violating § 2339B by providing himself as "personnel" to a foreign terrorist organization, the Government is not required to charge (or, ultimately, to prove) that a defendant planned, aided, or committed an act of terror at the direction of, or in coordination with, the foreign terrorist organization; such a requirement would be inconsistent with both the text and the purpose of § 2339B, which, as noted, was intended to prohibit the "*aid* that makes [terror] attacks more likely to occur"—not terror acts themselves. *Humanitarian Law Project*, 561 U.S. at 35 (emphasis added). Rather, § 2339B requires less: As relevant here, the statute "criminalizes providing personnel through self-recruitment (*i.e.*, volunteering oneself to serve under the direction of a terrorist organization." *United States v. Farhane*, 634 F.3d 127, 151 (2d Cir. 2011). In other words, a material-support-by-self-recruitment

prosecution under § 2339B "focuses on [whether the defendant] submi[tted] to the direction and control of a terrorist organization"—not on whether he in fact undertook a "particular engagement or activity." *Id.* at 152. *See also id.* at 152 ("[W]hen a person supplies himself as the bomber or pilot or doctor sought by the terrorist organization, he provides—or certainly attempts to provide—material support in the form of personnel as soon as he pledges to work under the direction of the organization.")

With this understanding of § 2339B, the Court considers the Defendant's as-applied First Amendment challenge to the statute. That challenge is informed heavily by the Supreme Court's decision in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). In *Humanitarian Law Project* the Supreme Court considered the constitutionality of § 2339B as applied to several organizations that sought to provide various forms of assistance to foreign terrorist organizations. As relevant here, the Court rejected the organizations' argument that, as applied to them, § 2339B(a)(1) violated their First Amendment right to free speech. Section 2339B, the Court held, does not "suppress ideas or opinions in the form of 'pure political speech.'" *Id.* at 26. Section 2339B instead prohibits "'material support,' which most often does not take the form of speech at all." *Id.* But even when "material support" does take the form of speech, the Court held that § 2339B "is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Id.* (footnote omitted). Indeed, the Court observed, the "most important[]" reason why Congress drew a constitutional line between permissible and prohibited speech is that, in § 2339B, "Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or

controlled by foreign terrorist groups." *Id.* at 36. Moreover, the Court noted that its holding "in no way suggest[ed] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations." *Id.* at 39. In short, *Humanitarian Law Project* held that, while § 2339B does not proscribe pure speech—even radical speech that "might be viewed as promoting the group's legitimacy," *id.* at 32—it *does* prohibit "activities . . . directed to, coordinated with, or controlled by foreign terrorist groups." *Id.* at 36. As applied to the proposed activities of the organizations in *Humanitarian Law Project*, the Supreme Court held that § 2339B did not violate their First Amendment right to free speech.

For similar reasons, the Court also rejected the organizations' claim that § 2339B violated their First Amendment right to free association. Section 2339B does not, the Court noted, "penalize mere association with a foreign terrorist organization." *Id.* at 39. Rather, what it "prohibits is the act of giving material support." *Id.* (quotation marks omitted). But to the extent § 2339B burdened the organizations' free-association rights, the Court held that such a burden "is justified for the same reasons that [the Court] . . . denied [the organizations'] free speech challenge. It would be strange if the Constitution permitted Congress to prohibit certain forms of speech that prohibit material support, but did not permit Congress to prohibit that support only to particularly dangerous and lawless foreign organizations." *Id.* at 40.

Turning to the facts of this case, the Defendant's First Amendment argument appears to rely on the subtle distinction described above between, on the one hand, an illegal effort to volunteer or work for a foreign terrorist organization and, on the other, an

effort to simply express solidarity with, or an intent to become a member of, a foreign terrorist organization. The Defendant argues that, because he is charged only with attempting to provide himself to ISIL, he is charged only with something that § 2339B does not prohibit: "simple membership in a terrorist organization." Def. Ob. (Docket No. 56) at 3 (quoting *Farhane*, 634 F.3d at 138).

This argument is without merit because the anticipated trial evidence shows that the Defendant attempted to work "under the direction of, or in coordination with" ISIL. *Humanitarian Law Project*, 561 U.S. at 26. It is important to recognize that "[m]ere association is different than working or assisting in the operation of a terrorist organization." *United States v. Taleb-Jedi*, 566 F. Supp. 2d 157, 168 (E.D.N.Y. 2008). Section 2339B criminalizes the latter, constitutionally-unprotected activity—not the former. *See id.* at 176 ("[A] person may have the right to independently advocate the goals of an FTO, . . . and even to be a member of an organization, [but] a defendant does *not* have the right to act as an employee of such an organization and engage in work, no matter how apparently benign. It is work under the terrorist organization's direction or control . . . that [§ 2339B] seeks to prohibit and that is not constitutionally protected.") (emphasis in original); *United States v. Warsame*, 537 F. Supp. 2d 1005, 1014 (D. Minn. 2008) ("Section 2339B does not prohibit membership in Al Qaeda, nor does it prohibit persons from espousing or sympathizing with the views of Al Qaeda, however unpopular those views might be.") Interpreted in this way, § 2339B's proscription on providing "personnel" to a foreign terrorist organization follows the "critical line for First Amendment purposes . . . between advocacy, which is entitled to full protection, and action, which is not." *Healy v. James*, 408 U.S. 169, 192 (1972).

The line between advocacy and action is, to be sure, a hazy one, particularly in an attempt case such as this one. This is especially true given that the "action" § 2339B(a)(1) criminalizes may be minor or look benign. *See Farhane*, 634 F.3d at 148 ("The material support statute criminalizes a range of conduct that may not be harmful in itself but that may assist, even indirectly, organizations committed to pursuing acts of devastating harm.") Section 2339B may, then, leave a person little room to associate with a foreign terrorist organization without violating the statute. But it is clear that § 2339B does not "establish[] guilt by association"; rather, it requires a defendant to commit some act that "establish[es] that [the] individual's association poses the threat feared by the Government in proscribing it." *United States v. Robel*, 389 U.S. 258, 265 (1967). That act may, as noted, be minor, but in passing § 2339B, Congress found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act, 110 Stat. 1214, 1247, Pub. L. 104-132, § 301(a)(7) (found in statutory note to 18 U.S.C. § 2339B). That finding is "entitled to significant weight," particularly "[g]iven the sensitive interests in national security and foreign affairs at stake." *Humanitarian Law Project*, 561 U.S. at 36. Thus, even if § 2339B's ban on providing oneself as "personnel" to a foreign terrorist organization may "burden . . . [a person's] freedom of association," that burden "is justified" by Congress's finding that seemingly-benign aid to a foreign terrorist organization cannot meaningfully be separated from that organization's criminal goals. *Id.* at 40. In other words, if § 2339B limits a person's freedom of association, it does so only when that association takes the form of something more than mere membership—for instance,

association that involves working "under the direction of, or in coordination with" a foreign terrorist organization. *Id.* at 26. At bottom, "[t]he First Amendment's guarantee of associational freedom is no license to supply terrorist organizations with resources or material support in any form, including services as a combatant." *United States v. Lindh*, 212 F. Supp. 2d 541, 570 (E.D. Va. 2002). Section 2339B respects the First Amendment line between action and advocacy by requiring the Government to prove the former to obtain a conviction.

With this distinction in mind, the Court considers the Government's proffer as to how the Defendant allegedly violated § 2339B(a)(1) by attempting to provide himself as "personnel" to ISIL. *See Taleb-Jedi*, 566 F. Supp. 2d at 168 (relying on government proffer of anticipated trial evidence to reject motion to dismiss § 2339B charge on First Amendment grounds). The Government proffers that, at trial, it will show that the Defendant "intended to provide himself to ISIL as a fighter, knew and intended that he would obey ISIL's leadership, and knew well that ISIL engages in terrorism." Gov't Resp. (Docket No. 58) at 7. Specifically, the Government states that its trial proof "will . . . include the defendant's Twitter pledge to support Abu Bakr al-Baghdadi, the leader of ISIL; the defendant's numerous Twitter posts regarding ISIL's terroristic activities, including killings and beheadings; and the defendant's numerous statements to others about ISIL's activities and his support of ISIL." *Id.* Critically for First Amendment purposes, the Government also proffers that, at trial, its evidence will "prove that the [D]efendant prepared to provide himself to ISIL by buying combat gear through eBay, . . . by going to a shooting range, by seeking advice from an individual[] who had previously attended a terrorism training camp, and by traveling to Turkey as part of his

plan to enter Syria to join ISIL." *Id.* at 7-8. Finally, the Government proffers that it will introduce evidence seized from searches of the Defendant's computer and home—such as "a photograph of the defendant dressed in combat gear, holding what appears to be an AK-47, and standing in front of the Shahada flag"—as well as text messages between the Defendant and a family member "which were sent just hours before the [D]efendant's trip in July 2014 to Turkey." *Id.* at 8. Those text messages, the Government states, "make[] reference to [the Defendant] possibly never seeing his family again." *Id.*

The Government's proffer is sufficient to deny the Defendant's motion to dismiss. Specifically—and most importantly—the Defendant's travel to Turkey with the alleged intent of entering Syria to join ISIL, combined with the Defendant's purchase of combat gear, make abundantly clear that the Defendant "is not being charged with mere association." *Taleb-Jedi*, 566 F. Supp. 2d at 168 (emphasis omitted). Rather, he is being charged with attempting to "work[] or assist[] in the operation of a terrorist organization"—conduct for which the First Amendment provides no protection. *Id.* It is true that some of the evidence on which the Government will likely rely at trial—for instance, the Defendant's Twitter posts—is, standing alone, either First Amendment-protected speech or evidence of First Amendment-protected association. But the Government's proffer shows that the Defendant is not being charged with simply expressing radical beliefs on Twitter, nor is he being charged with attempting to merely become a member of ISIL; he is instead being charged with attempting to act on that radical speech by attempting to volunteer himself as a fighter to ISIL. The Defendant's First Amendment-protected conduct is, of course, not criminal, but that conduct may be

used to show that the Defendant's other actions (for instance, traveling to Turkey) were undertaken with the intent of engaging in criminal conduct. *See United States v. Hassan*, 742 F.3d 104, 127 (4th Cir. 2014) (in affirming multiple terrorism-related convictions, noting that "it was entirely consistent with the First Amendment to make 'evidentiary use of [the defendants'] speech to establish the elements of their crimes or to prove motive or intent'") (quoting *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993)) (brackets omitted). Section 2339B(a)(1) criminalizes, and the First Amendment does not protect, such conduct.

The Court therefore overrules the Defendant's objections and adopts Judge Scott's recommendation to deny the Defendant's motion to dismiss.[5]

### 2. Motions to suppress

Next, the Defendant moves to suppress evidence recovered from searches of (1) 151 Olcott St., Lackawanna, New York; and (2) a Gmail account that, the Defendant

---

[5]  The Defendant's objections are focused primarily on the argument that § 2339B, as applied to him, violates the First Amendment. In addition, the Defendant makes a brief argument that § 2339B is facially unconstitutional. Def. Ob. at 3. This argument it is without merit because the Defendant's "conclusory declaration that § 2339B is overbroad do[es] not come close to carrying []his burden" of showing that § 2339B imposes a "'substantial infringement' of speech." *Farhane*, 634 F.3d at 136-37 (emphasis omitted) (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). *See also id.* at 136 ("A law is unconstitutionally overbroad if it 'punishes a substantial amount of protected free speech, judged in relation to its plainly legitimate sweep.'") (quoting *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003)) (brackets omitted).

   The Defendant also briefly argues that, as applied to him, § 2339B is unconstitutionally vague because "the only material support listed [in the indictment] is 'himself.'" Def. Ob. at 3, 4. "Such a general complaint is now foreclosed by *Holder v. Humanitarian Law Project.* The Supreme Court there observed that the[] term[]" "personnel" in § 2339B "did not require the sort of 'untethered, subjective judgments' that had compelled it to strike down statutes tying criminal culpability to vague concepts such as 'annoying' or 'indecent' conduct. The Court identified further protection against vagueness in Congress's addition of 'narrowing definitions' for the[] term[], which 'increased [its] clarity,' as well as in the knowledge element required for a § 2339B conviction." *Farhane*, 634 F.3d at 140 (quoting *Humanitarian Law Project*, 561 U.S. at 21) (brackets omitted). Moreover, given the allegations in this case—pledging support to ISIL, stocking up on combat equipment, and making two trips to Turkey with the goal of entering Syria and joining ISIL—the Defendant's alleged conduct "falls squarely within the core of [§ 2339B's] prohibition [on providing 'personnel' to a foreign terrorist organization], defeating any suggestion that he lacked notice that his conduct was unlawful or that the statute was enforced arbitrarily with respect to him." *Id.* at 140-41.

asserts, is associated with him.  *See* Docket No. 46 ¶ 5.  As to the search of 151 Olcott St., Judge Scott concluded that the search warrant was supported by probable cause (Docket No. 37 at 16), and as to search of the Gmail account, Judge Scott concluded that the Defendant had "not shown that he even owned the Gmail account at issue, much less shown a privacy interest in the contents of that account."  Docket No. 52 at 9.  Thus, Judge Scott recommends denying both of the Defendant's suppression motions.

The Defendant objects to these recommendations.  The substance of the Defendant's objection, however, is two sentences: He argues that "[t]he purported probable cause points to the defendant's allegiance and willingness to join the foreign terrorist organization.  For all the reasons submitted thus far, it is unconstitutional to criminalize such thoughts or actions."  Def. Ob. at 4.

Federal Rule of Criminal Procedure 59(b)(2) provides that a party may file "*specific* written objections" to a magistrate judge's recommendation.  (Emphasis added.)  The Local Rules of Criminal Procedure elaborate on Rule 59(b)(2)'s specificity requirement by instructing that objections "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."  L. Crim. R. 59(c)(2).  "The purpose of the Federal Magistrates Act," and the rules that promulgate it, "is to increase the overall efficiency of the federal judiciary."  *Mineweaser v. City of N. Townawanda*, 14-CV-144-RJA-JJM, 2016 WL 3279574, at *1 (W.D.N.Y. June 15, 2016) (quotation marks omitted).  Both Rule 59(b)(2) and Local Criminal Rule 59(c)(2) "promote[] this goal by requiring parties to identify for the district court those parts of a report and recommendation that might be incorrect."  *Id.*

The Defendant's summary objection to Judge Scott's recommendations does not comply with Rule 59's specificity requirement. It does not specify the parts of Judge Scott's recommendations with which the Defendant disagrees; it does not explain how, in the Defendant's view, Judge Scott's recommendations were incorrect; and it does not identify the legal basis for the Defendant's objections. Indeed, although the Defendant purports to object to Judge Scott's recommendations to deny both suppression motions, the Defendant does not discuss the issue of standing, which was the basis for Judge Scott's recommendation as to the Gmail search warrant.

Failure to properly object to a magistrate judge's report and recommendation "waives a party's right to review" of that recommendation. Fed. R. Crim. P. 59(b)(2). As a result, the Court reviews Judge Scott's recommendations for clear error. *See Mineweaser*, 2016 WL 3279574, at *2; *United States v. Preston*, 635 F. Supp. 2d 267, 269 (W.D.N.Y. 2009) ("The district court may adopt those portions of a report and recommendation to which no objections have been made, as long as no clear error is apparent from the face of the record.") The Court has carefully reviewed both of Judge Scott's Reports and Recommendations, as well as the record in this case. After its review, the Court finds no clear error in either of Judge Scott's recommendations to deny the Defendant's suppression motions. The Court therefore denies both motions.

### 3. Motion for a bill of particulars

Finally, the Government appeals Judge Scott's order directing the Government to provide the Defendant with a bill of particulars. As noted earlier, the Court reviews this order to determine whether it is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A).

The concern underlying Judge Scott's particularization order appears to be that the charges in this case—*attempting* to provide material support to a foreign terrorist organization by volunteering to join that foreign terrorist organization—may look like (or, perhaps, even include) something § 2339B does not criminalize and the First Amendment protects: independently supporting a foreign terrorist organization. *See* Docket No. 37 (Report and Recommendation) at 19 ("[T]he Court finds that defendant is entitled to a Bill of Particulars inasmuch as the defendant is not sufficiently advised of the charges against him to allow for the proper preparation of a defense (particularly, this constitutional challenge to those charges), to avoid surprise at trial, and to protect the defendant from double jeopardy.") To alleviate this concern, Judge Scott ordered the Government to particularize "the conduct and or statements manifesting defendant's intent to assist ISIS; [and] the overt act(s) that constitute substantial step(s) toward completion of the offense of providing material assistance to a foreign terrorist organization." *Id.*

The fundamental question a court must answer when deciding whether to order particularization is "whether the information sought is necessary, not whether it is helpful." *United States v. Facciolo*, 753 F. Supp. 449, 451 (S.D.N.Y. 1990). A bill of particulars should therefore be ordered only where "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (quotation marks omitted). For instance, a bill of particulars might be necessary where a defendant would be subject to "unfair[] surprise[] at trial" if he did not receive particularization. *Id.* (quotation marks omitted). Similarly, a bill of particulars might be necessary if an

indictment is so general that it does not allow a defendant adequately "to prepare for trial." *United States v. Bortnovksy*, 820 F.2d 572, 574 (2d Cir. 1987). And, finally, a bill of particulars might be necessary to allow a defendant "to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *Id.*[6] It is the defendant's burden to show that a bill of particulars is necessary. *See, e.g.*, *United States v. Ferguson*, 478 F. Supp. 2d 220, 226 (D. Conn. 2007).

Several other principles limit the scope or necessity of particularization. First, a bill of particulars is not a discovery device, nor is it a way for a defendant to obtain a preview of "the manner in which [the Government] will attempt to prove the charges, []or the means by which the crimes charged were committed." *United States v. Fruchter*, 104 F. Supp. 2d 289, 311 (S.D.N.Y. 2000) (citations omitted).[7] And second, even if an indictment is so general as to risk unfair surprise at trial or an inability to prepare a defense, "a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *United States v. Chen*, 378 F.3d 151, 163 (2d. Cir. 2004) (quotation marks omitted). For instance, "in determining whether to order a bill of particulars, a court must examine the totality of the information available to [the] defendant, both through the indictment and through pre-trial discovery." *United States v. Mostafa*, 965 F. Supp. 2d 451, 465 (S.D.N.Y. 2013) (citing *United States v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D.N.Y.

---

[6] The Government correctly notes that the double-jeopardy rationale for a bill of particulars, though frequently recited in caselaw, is of questionable importance in light of the other rationales for ordering a bill of particulars. *See* 1 Wright & Leipold, *Fed. Practice & Procedure: Criminal* § 130 n.3, 657 (4th ed. 2008) ("[T]he whole record may be consulted in passing on a plea of double jeopardy, and thus neither the indictment nor a bill of particulars is essential on that question.")

[7] Of course, if particularization is necessary the Government "'will be required [to particularize its charges] even if the effect is disclosure of evidence or of theories.'" *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998) (quoting 1 Wright, *Fed. Prac. & Proc.* § 129 (1982)).

2000)).  *See also United States v. Thomas*, Criminal No. 15-171, 2016 WL 3148204, at *1 (E.D. Pa. June 2, 2016) (in § 2339B material-support-by-personnel prosecution, denying bill of particulars where "Defendant ha[d] been given substantial access to discovery" and where affidavit in support of criminal complaint, which had been provided to defendant, "extensively specif[ied] Defendant's alleged conduct, including purchasing a plane ticket to Barcelona, researching buses from Barcelona to Istanbul, and engaging in communications suggesting an intent to engage in suicide bombing").

The Defendant has not responded to the Government's appeal of Judge Scott's particularization order, but the Defendant's argument for particularization appears to be that, without particularization, the Court cannot properly rule on his motion to dismiss—indeed, he asks for permission to renew his motion to dismiss "if the Government is ultimately required to" particularize the indictment's allegations.  *See* Def. Ob. at 3 n.1. Judge Scott's order directing particularization relies on a similar premise: that, without particularization, the indictment does not provide the Defendant with adequate notice of how his alleged conduct is both illegal under § 2339B and not protected by the First Amendment.

A bill of particulars, however, is not the proper procedural vehicle for presenting a First Amendment defense to the charges in this case.  As an initial matter, if an indictment is invalid because it does not adequately apprise the Defendant of how his alleged conduct is not protected by the First Amendment, "[a] bill of particulars may not [be used to] save [the] invalid indictment."[8]  *United States v. Carrier*, 672 F.2d 300, 303 (2d Cir. 1982) (reversing district court decision to dismiss, on First Amendment grounds, indictment charging defendant with threatening to kill the President because, according

---

[8]  The Court does not suggest that the indictment in this case is invalid.

to the district court, the indictment "failed to include a description of the context within which the defendant uttered the[] words," thereby denying the defendant of the ability to raise a First Amendment defense). And while a bill of particulars "may provide the defendant with the evidentiary details needed to establish his [First Amendment] defense," *id.*, the Defendant here has not shown how any First Amendment defense *at trial* (rather than in pretrial proceedings) would change if he received his requested particularization. In other words, the Defendant has not shown, as he must, how his ability to prepare for trial will depend on the requested particularization. Finally, a bill of particulars would not get the Defendant any closer to pretrial dismissal than his motion to dismiss did: If the Court ordered a bill of particulars, the Defendant could not then renew his motion to dismiss, seeking dismissal of the particularized indictment. The validity of an offense charged in an indictment may not be challenged with evidence outside the indictment, such as a bill of particulars. *See* 1A Wright & Leipold, *Federal Practice & Procedure: Criminal* § 194, 439-41 (4th ed. 2008) ("If a pretrial motion attacks the sufficiency of the indictment or information, the allegations of the pleading must be taken as true. Although Rule 47 permits affidavits in support of motions, neither it nor Rule 12 was intended to permit 'speaking motions,' that is, motions that require consideration of facts outside the pleadings. Were the rule otherwise, the truth of the allegations could be challenged by affidavit, and the pretrial motion could be turned into a trial of the general issue.") (footnotes omitted). *See also United States v. Rubbish Removal, Inc.*, 602 F. Supp. 595, 597 (N.D.N.Y. 1984) (considering *Carrier* and concluding that the court "may not consider evidence outside the indictment"— specifically, a bill of particulars—"on a challenge to its sufficiency").

The proper procedure for raising the Defendant's as-applied First Amendment challenge is, instead, by way of a post-trial motion. If the Defendant is convicted at trial, and if he has any valid First Amendment defense based on the evidence introduced at trial, he may of course file a Rule 29 motion seeking acquittal. *See United States v. Poulin*, 588 F. Supp. 2d 58, 62 & n.3 (D. Me. 2008) (denying pre-trial, as-applied First Amendment challenge to federal child pornography statute and collecting cases for the proposition that such a challenge is appropriately resolved by post-trial motion). In the context of a pretrial motion such as the one before the Court, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, [Federal Rule of Criminal Procedure] 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.) (affirming district court decision to decline to resolve, in a pretrial motion to dismiss, the constitutionality of a federal firearm statute as applied to the defendant). In other words, when a motion to dismiss implicates "facts surrounding the question of guilt or innocence," rather than "'facts peculiar to the motion'" (for example, a motion to suppress, a motion for severance, or a motion for a bill of particulars), *id.* at 1260 (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)), the motion likely cannot "be determined without a trial on the merits" and is, therefore, appropriately resolved after trial. Fed. R. Crim. P. 12(b)(3). That the Defendant's motion to dismiss is based on constitutional grounds does not change this conclusion. *See United States v. Mehanna*, 735 F.3d 32, 50-51 (1st Cir. 2013) (affirming § 2339B convictions, among others, over the defendant's First Amendment challenge, observing that "jurors are endowed with expertise in factfinding," and that "[t]hat presumed expertise is not vitiated

even when performing the factfinding task requires them to separate constitutionally protected conduct from illegal conduct").

The Court therefore vacates Judge Scott's order directing particularization. By doing so, the Court does not suggest that Judge Scott's order was clearly erroneous or that Judge Scott abused his sound discretion. Rather, the Court concludes that Judge Scott's particularization order was "contrary to law," 28 U.S.C. § 636(b)(1)(A), because it sought to use a bill of particulars to help answer the question whether the indictment should be dismissed on First Amendment grounds. That question, however, cannot be answered until after trial.

## CONCLUSION

For the reasons stated above, the Defendant's objections are overruled. The Court therefore adopts Judge Scott's recommendation to deny the Defendant's motion to dismiss the indictment, as well as Judge Scott's recommendations to deny the Defendant's motions to suppress. Further, the Court vacates Judge Scott's order directing the Government to provide a bill of particulars.

The parties shall appear on May 26, 2017 at 9:00 a.m. for a meeting to set a trial date.

**SO ORDERED.**


Dated: May 23, 2017          _s/Richard J. Arcara_
    Buffalo, New York        HONORABLE RICHARD J. ARCARA
                             UNITED STATES DISTRICT JUDGE