1
               **UNITED STATES DISTRICT COURT**
              **WESTERN DISTRICT OF NEW YORK**

2

3

UNITED STATES OF AMERICA,     )
4
                          )  Case No.  1:15-CR-00148A
                          )           (RJA)(JJM)
5
             Plaintiff,   )
                          )
6
vs.                     )  June 11th, 2018
                          )
7
ARAFAT M. NAGI,          )
                          )
8
             Defendant.   )

9

10
               **TRANSCRIPT OF SENTENCING**
      **BEFORE THE HONORABLE RICHARD J. ARCARA**
11
        **SENIOR UNITED STATES DISTRICT JUDGE**

12

13
<u>APPEARANCES</u>:

14
For the Plaintiff:   JAMES P. KENNEDY, JR.
                       UNITED STATES ATTORNEY
15
                       BY:  TIMOTHY C. LYNCH, ESQ.
                       ASSISTANT UNITED STATES ATTORNEY
16
                       138 Delaware Avenue
                       Buffalo, NY 14202
17
For the Defendant:   JEREMY SCHWARTZ, ESQ.,
18
                       300 Main Street
                       Buffalo, NY 14202
19
Probation Officer:   ALEXANDRA PISKORZ
20
Court Reporter:      MEGAN E. PELKA, RPR
21
                       Robert H. Jackson Courthouse
                       2 Niagara Square
22
                       Buffalo, NY 14202

23

24

25

U.S. v. NAGI  --  SENTENCING                                    1

1          THE CLERK:  Criminal action 2015-148A.  United States

2    v. Arafat M. Nagi.  Sentencing.  Counsel, please state your

3    name and the party you represent for the record.

4          MR. LYNCH:  Timothy Lynch for the government, Your

5    Honor.

6          MR. SCHWARTZ:  Good afternoon, Your Honor.  Jeremy

7    Schwartz for Mr. Nagi.

8          THE COURT:  Good afternoon.  Are we ready?

9          MR. LYNCH:  Yes, Judge.

10          MR. SCHWARTZ:  Yes, Judge.

11          THE COURT:  The defendant stands before the Court for

12    sentencing on his previous plea of guilty to one count of

13    attempting to provide material support to a designated foreign

14    terrorist organization, that is, the Islamic State, in

15    violation of United States Code, Title 18,

16    Section 2339B(a)(1).  I know, Mr. Schwartz, you reviewed the

17    report.  I assume you reviewed it with your client?

18          MR. SCHWARTZ:  Yes, Your Honor.

19          THE COURT:  The Court hereby accepts the terms and

20    conditions of the plea agreement and the plea of guilty.  I

21    will now place the report in the record under seal.  If an

22    appeal is filed, counsel on appeal will be permitted access to

23    the recommendation section -- will not be permitted access to

24    the recommendation section in the event of an appeal.

25          Both parties have filed the appropriate statement of

U.S. v. NAGI  --  SENTENCING

2

1   parties with respect to sentencing factors.  There's no

2   dispute about the facts in the report and therefore, the Court

3   adopts these facts as its findings of fact and hereby

4   incorporates them into the record.  There are no objections to

5   the probation officer's conclusions as to the applicable

6   guidelines.

7        Report recommends that the defendant's base offense

8   level under Guideline Section 2M5.3(a) is 26.  The report also

9   recommends a two-level upward adjustment, pursuant to

10  2M5.3(b)(1)(E), as the offense involved provisions of material

11  support or resources in the form of personnel, with the

12  intent, knowledge or reason to believe that that support or

13  those resources are going to be used to commit or assist in

14  the commission of a violent act.

15       The report also recommends a 12-level upward

16  adjustment, pursuant to 3A1.4(a), as the offense is a felony

17  intended to promote a federal crime of terrorism as that term

18  is defined in 18 U.S.C. Section 2332b(g)(5).  The report also

19  recommends a three-level downward adjustment based upon the

20  acceptance of responsibility and accordingly recommends the

21  offense level at 37.

22       The criminal history category is one, but because

23  defendant has been convicted of a federal crime of terrorism,

24  pursuant to Guideline Section 3A1.4(b), his criminal history

25  category is increased to six.

1          Under this calculation, the advisory guideline range

2    is a term of 360 months to life.  However, the statutory

3    maximum term of imprisonment is 15 years.  Therefore, the

4    guideline term of imprisonment is 180 months or 15 years.  The

5    advisory range for supervised release is a term of one year to

6    life.  The advisory range for a fine is $20,000 to $200,000,

7    plus the cost of imprisonment and supervised release.

8          In accordance with the Supreme Court decision, *U.S.*

9    *v. Booker* and the Second Circuit decision *U.S. v. Crosby*, the

10   Court must consider the guidelines, is not bound by them.  The

11   Court must also consider the factors in 18 U.S.C. 3553(a).

12   Now, I have received three letters on behalf of the defendant,

13   which I have considered.  I've read.  One letter is from him

14   personally and one from his daughter and the third one, I

15   don't remember the third one.

16          MR. LYNCH:  I think it was his mother, Judge.

17          THE COURT:  Oh, yeah.

18          MR. SCHWARTZ:  Yes, Judge.

19          THE COURT:  The mother.  Oh, okay.  Yeah, I read it.

20   Okay.  This is it.  Right.  That was among it.  Okay.

21   Mr. Schwartz?

22          MR. SCHWARTZ:  Thank you, Judge.  Well, this is a

23   case where I'm going to ask the Court to find that the

24   guidelines range is unreasonable, given the circumstances.

25   I'm going to ask the Court to use its discretion to find a

U.S. v. NAGI  --  SENTENCING

4

1   sentence that's lower than the statutory maximum, but that is

2   sufficient to meet the goals of the Sentencing Reform Act.

3   Pretty much anybody that pleads to or is convicted of this

4   offense will receive a guidelines -- or recommended guideline

5   range well above the statutory maximum.  And to say that every

6   single case should receive the statutory maximum, I think,

7   shows faulty reasoning behind the statute and the guidelines.

8          That's why I think a much lower sentence is

9   appropriate in this case and I'll get to why specifically.  I

10  don't think -- I think a sentence of a statutory maximum is

11  greater than necessary in Mr. Nagi's specific case.  But

12  again, here we have a statutory range of anywhere from 0 years

13  up to 15 years.  And the guidelines are going to say everybody

14  gets 15 years by pleading guilty to or being convicted of that

15  specific offense.

16         That could be a person that actually went and fought

17  in another country with a terrorist organization.  It could be

18  a person that actually makes threats to United States citizens

19  or to the United States, that actually recruits individuals

20  within the United States to strengthen --

21         THE COURT:  But I think in those situations, the

22  government -- as far as negotiating a plea, if it was a more

23  aggravated case than maybe we have here, may not be so

24  receptive to a lesser plea than in here.  The original

25  indictment had two counts.

1           MR. LYNCH:  Yes, Judge.  The maximum he faced

2     originally was 35 years.

3           THE COURT:  Yeah.  So, your argument goes a little

4     shallow, Mr. Schwartz, in that regard, because had there been

5     more aggravating circumstances than maybe we have here, maybe

6     the government would not have given the plea that they

7     offered.  And had he gone to trial and had he been convicted,

8     he may have been in a situation where he was facing 35 years.

9           MR. SCHWARTZ:  Well, that is possibly true, Judge.

10    But again, there are people throughout the country that

11    receive -- and obviously, the Court has to consider the case

12    before it, but --

13          THE COURT:  That's right.

14          MR. SCHWARTZ:  -- also has to consider unwarranted

15    sentencing disparities.  And we have a --

16          THE COURT:  Well, how does that apply here?  Now

17    where -- you're saying unwarranted disparity in comparison to

18    what?

19          MR. SCHWARTZ:  Well, Judge, we have -- I think this

20    is -- represents the lowest form of providing or attempting to

21    provide material support to an organization.  And that's

22    because what he was -- what he tried to provide to the

23    organization was himself.  In other words, he was attempting

24    to join an organization that he thought was on the right side

25    of a war halfway across the world.  That's -- and he didn't

U.S. v. NAGI  --  SENTENCING

6

1    try to bring -- he wasn't bringing anybody else.

2           THE COURT:  He tried to bring a couple other people.

3           MR. SCHWARTZ:  Well, again, there were discussions

4    amongst other people, but he wasn't recruiting people for ISIS

5    or for the Islamic State and he wasn't doing so within the

6    United States.  Well, he wasn't trying create a sect in the

7    United States.  From the beginning of this case, the

8    government always agreed that there was no claim that Mr. Nagi

9    was going to cause any harm to anyone in the United States, to

10   any specific American, that he had any ill will toward the

11   United States.

12          But he put on social media, which is what brought --

13   which really is something that he's paying for.  He's paying a

14   very high price for that social media.  And obviously, that's

15   happening a lot in our world today.  People lose their jobs

16   for what they put on social media.  People put things they

17   don't necessarily mean on social media.  People say things

18   that they're not necessarily going to follow through --

19          THE COURT:  I learned an expression when I was in the

20   military, when I was in Korea, it was called mianhabnida.  Do

21   you know what that means?  Sorry about that.  I mean, you put

22   it on the internet or FaceTime, it's -- I mean, no one's

23   forcing you to do it.

24          MR. SCHWARTZ:  Well, no, Judge.  But --

25          THE COURT:  What it does, it gives you an indication

1   of what you're feeling, what your intent is.

2            MR. SCHWARTZ:  Well, sure, Judge.  But now we're in a

3   time where someone can -- no matter what state of mind they're

4   in, whether it's the right state of mind, whether it's the

5   middle of the night, whether they've just been inflamed by

6   something they saw on the TV, it's not wise to do, but a lot

7   of people do it; jump to the social media or jump to whatever

8   they have available and say things that, again, they wish they

9   didn't say.

10           THE COURT:  Well, that's -- I'm sorry.  You said it.

11           MR. SCHWARTZ:  But not everybody goes to jail for

12   that.

13           THE COURT:  Well, it depends what you say.

14           MR. SCHWARTZ:  Well, that's true.  We just had a

15   politician wish another world leader would go to Hell for the

16   way -- for the way they've acted.  I don't know that they

17   actually believe that, but this is what people -- people say

18   terrible things.

19           And I'm not saying Mr. Nagi didn't say terrible

20   things.  He concedes that.  And I think once he has reflected

21   over all of these tweets and all of these Facebook posts,

22   which I've gone over with him over the last three years that

23   have -- when you see them all together, he is sort of

24   mortified by what he said.

25           And his state of mind is entirely different than it

U.S. v. NAGI  --  SENTENCING

8

```
 1   was when I first met him.  When I first met him three years
 2   ago, he thought, well, I have the freedom of speech.  I don't
 3   understand.  Why am I here?  I have religious freedoms.  I can
 4   express those beliefs and I can express political beliefs.
 5   And he's right about all of that.  That's actually one of the
 6   things he does love about this country and he does.  He's
 7   actually a patriotic individual.
 8            But based on this conviction, it looks entirely
 9   different.  But he's never had -- harbored ill will towards
10   the United States.  Again, he thought --
11            THE COURT:  What?  Do you think the United States is
12   operating on good terms with ISIS?
13            MR. SCHWARTZ:  No, Judge.  But what's happening in
14   Syria, he thought that -- from what he saw, from the facts
15   from his religious -- his Muslim beliefs, what he saw was
16   happening, he thought the Islamic State might not have been
17   right about everything, but they were more right about one
18   side over the other.
19            He thought people were being slaughtered for their
20   religious beliefs.  And that's what got to him.  That's what
21   outraged him.  And what we saw on the Twitter and Facebook and
22   whatever else he might have told people throughout the
23   community in Lackawanna, just in the local grocery store,
24   that's the outrage he expressed.
25            THE COURT:  By the way, you said something that
```

U.S. v. NAGI  --  SENTENCING

9

1   intrigues me.  You said that this was all on Facebook.

2           MR. SCHWARTZ:  Well, mostly there was --

3           THE COURT:  But he went to Turkey with the idea of

4   going to Syria --

5           MR. SCHWARTZ:  No, that's --

6           THE COURT:  -- to assist ISIS.

7           MR. SCHWARTZ:  That's right.  That's what he's

8   admitted that he was going there to --

9           THE COURT:  That's not what he says in his letter to

10  me.  In his letter to me -- it's kind of interesting.  He says

11  I'm writing to you, Your Honor, to ask for leniency.  He says,

12  my own actions and behavior on social media, expressing my

13  feelings and political beliefs, which were taken out of

14  context -- he went on to say -- I'm taking parts of it --

15  watching the atrocities and massacre that was aired on the

16  Middle Eastern mainstream media -- knew against the innocent

17  people of Syria.

18          Then it goes on, I wanted to help the people of Syria

19  in any way I could.  And then he goes on and says, I wanted to

20  help, not as a fighter and -- as some suggested, but to help

21  in a way that I would get involved in the fighting -- I won't

22  get involved in the fighting, but to volunteer humanitarian

23  aid to help distribute food, water, clothing, et cetera for a

24  short while.  I started thinking about it in mid-flight on my

25  way to Turkey on what I was about to get into.  Then he says,

1   I thought about my aging mother that relies upon me and her

2   oldest from her kids.

3         I mean, you read that -- and this is a couple more

4   sentences here.  The point here is, Your Honor, I'm not a

5   fighter or I could have stayed in Yemen and joined the

6   fighting.  I wanted to help the Syrian people suffering from

7   that war, because all I wanted was freedom; not to get

8   involved in a war by picking up weapons.  The letter to you is

9   from my heart, the truth, no fabricated story to just earn

10  your sympathy.

11        Then, when you read the presentence report and then

12  you read the government's response to the sentencing, there's

13  a picture of your client.  Does that look like someone who's

14  going to get involved in humanitarian aid?  I mean, he's there

15  with a machine gun, with a AR-15, with a mask.  He had the

16  flag of ISIS.  I'm not sure I know what else in this picture.

17  Mr. Lynch, I can't tell what else is in it.

18        MR. LYNCH:  He's wearing camouflage gear.  He's

19  got -- his face is covered, as you pointed out and he's

20  saluting -- he's putting his hand up next to his head as

21  though he was saluting them, like you would salute the

22  American flag.

23        THE COURT:  So, when you see something like this and

24  read the government -- unless the government's statement here

25  is not very accurate -- certainly paints a totally different

1   picture than the picture that he -- in fact, I read his letter

2   first.

3            And I remember at the time of the plea, I found him

4   to be very respectful to the Court.  And I was -- I expected

5   somebody a little different than appeared before me at the

6   time of the plea.  And I even said to myself, my gosh, he

7   sounds sincere.  It's hard to believe that that person is the

8   one that the government is making all these accusations

9   against.  But when I read this, after reading his letter, I'm

10  getting hoodwinked a little bit here, you might say.

11            MR. SCHWARTZ:  I don't know that that's --

12            THE COURT:  Well, I'm just saying what he did.  This

13  isn't social media.

14            MR. SCHWARTZ:  Well, that is on social -- well --

15            THE COURT:  Well, you say he made a mistake?  He

16  didn't intend to do this?

17            MR. SCHWARTZ:  Judge, I would never use that word.

18            THE COURT:  How do you go out to help and give

19  humanitarian aid wearing this kind of an outfit with a veil,

20  with the ISIS flag and having an AR-15?  Is that what it's

21  called?

22            MR. LYNCH:  Yes, Judge.

23            THE COURT:  An AR-15.

24            MR. SCHWARTZ:  Judge, I think that picture was taken

25  in the basement in Lackawanna.  He wasn't caught wearing that

1   overseas.  There's no -- this is where I'm making the

2   distinction that taking that photo and certainly, posting it

3   on anything is very ill advised.  It's not a good idea at all.

4           THE COURT:  Unless you really mean it.

5           MR. SCHWARTZ:  No, no.  Because I think --

6           THE COURT:  You don't think he meant it?

7           MR. SCHWARTZ:  I don't know if he meant it.  At the

8   very moment, I think he was -- that picture is a symbolic show

9   of support for --

10          THE COURT:  For ISIS.

11          MR. SCHWARTZ:  For the Islamic State, which he

12   thought was on the right side of a war.  Again, that's going

13   on, to this day, at the other end of the world.  And --

14          THE COURT:  Well, my recollection of some of the

15   things that I saw on TV from ISIS were they were killing, I

16   think, a British reporter?

17          MR. LYNCH:  Yes.

18          THE COURT:  They beheaded -- I mean, I can't even

19   watch it on television.  It's so horrible to watch and to want

20   to join up with that group.  To give humanitarian aid to the

21   people -- and yet you're cutting off -- last I know, the

22   reporter wasn't involved in any combat situation or -- he was

23   reporting what was going on.  And who were some of the other

24   people?  I don't have a recollection --

25          MR. LYNCH:  Daniel Pearl was a U.S. citizen that

1   was --

2           THE COURT:  U.S. citizen.

3           MR. LYNCH:  -- killed by ISIS.

4           THE COURT:  Was he involved there with ISIS or

5   fighting ISIS?

6           MR. SCHWARTZ:  No, Judge, but this becomes the

7   problem of holding Mr. Nagi responsible for everything the

8   Islamic State did that's wrong, because that's assuming he

9   agrees with all of that.  The statute --

10           THE COURT:  Well, what doesn't he agree with?

11           MR. SCHWARTZ:  Well, I'll let him talk to you about

12   that.

13           THE COURT:  Okay.

14           MR. SCHWARTZ:  Because I think that he can do it more

15   earnestly than I, but the statute does not outlaw fighting for

16   ISIS or the Islamic State or any other group.  What it outlaws

17   is providing support.  So, that could be --

18           THE COURT:  Or resources.

19           MR. SCHWARTZ:  Or resources, exactly.

20           THE COURT:  What do you think -- going over there and

21   fighting with ISIS, is that providing support?

22           MR. SCHWARTZ:  Well, even if you go over there to

23   feed the soldiers of ISIS, that's providing support and that

24   violates the statute.  And that's something for which the

25   guidelines would recommend the maximum.

1          THE COURT:  Is that good or bad?  You're saying

2   that's not fair?

3          MR. SCHWARTZ:  Well, it's -- I'm not -- he pled to

4   it.  And he's done -- he's already spent three years in local

5   jails for that and he is paying for that right now.  I'm not

6   saying it's good.  I'm contrasting it, though, to saying that

7   this is not necessarily the maximum type of --

8          THE COURT:  Let me ask you this.  You think this is

9   like, an isolated incident?  This went on over a long period

10   of time.

11          MR. SCHWARTZ:  I don't think his beliefs were an

12   isolated incident.  Let me talk about that because he was --

13          THE COURT:  Okay.

14          MR. SCHWARTZ:  I don't think his state of mind was

15   right.  As the Court is aware --

16          THE COURT:  One thing about your client, from the

17   plea that I had, he's a very intelligent man.

18          MR. SCHWARTZ:  And I think he's much more clearheaded

19   and well thought out now than he was three years ago.

20          THE COURT:  Well, he's not being sentenced for what

21   he did today.

22          MR. SCHWARTZ:  No, no.  I understand.

23          THE COURT:  He's being sentenced for what he did in

24   the past.

25          MR. SCHWARTZ:  I understand.  But also what must be

1   taken into account is, if he is the same person that would

2   have made those types of posts or made those types of attempts

3   that happened three years ago and I don't think he is.

4          THE COURT:  I'm not following you on that one at all.

5          MR. Schwartz:  Well, for example, if the Court is

6   sentencing somebody on a drug case and somebody was -- yes,

7   you have to sentence them for drugs that they sold how many

8   ever years ago.

9          But if the Court honestly believes that that person

10  has changed, understands what they did wrong and won't do it

11  again, the Court will take that into account and sentence to

12  maybe a lower sentence than it otherwise would have if you

13  think the person standing before you is still the same drug

14  dealer that was the drug dealer three years ago.  And I

15  think --

16         THE COURT:  Okay.  Other than the fact that he's been

17  in prison for a period of 34 months, which is almost three

18  years --

19         MR. SCHWARTZ:  He was in a bad --

20         THE COURT:  -- other than that, what else has

21  changed?

22         MR. SCHWARTZ:  Well, a lot has changed.  He's had a

23  lot of psychiatric evaluations.  He was on certain

24  medications.  He was diagnosed -- and I don't want to get into

25  all of the diagnoses -- they are contained in the presentence

1   report and reports that were filed with this Court -- but he

2   was having hallucinations in the beginning when I first met

3   him.

4         He is now looking back on his life and realized he

5   was taking a medication that he was taking too much of and it

6   was -- it was blurring his mind.  It was affecting his

7   thoughts.  Because, again, now that he can look past or look

8   back on his Twitter account and the types of things he was

9   saying and the thoughts he was having, he realizes that

10  they're irrational.

11        Most importantly, Judge, he realized that they're not

12  consistent with his Muslim beliefs, because he truly believes

13  in nonviolence.  That's not -- you can't engage in violence

14  but also be a good Muslim.  And that's something that I don't

15  know if that's a new --

16        THE COURT:  He believes in nonviolence?

17        MR. SCHWARTZ:  Well, that picture is a frightening

18  picture, but it's -- the firearm was not used.  It was legal

19  at the time.  And --

20        THE COURT:  So, it's a weapon.  You don't go hunting

21  with it.  It's a weapon to kill people.

22        MR. SCHWARTZ:  Well, yes, but it's a legal weapon.

23  And I'm not -- but again, I think that was more of a political

24  statement.  People have pictures of guns on their cars with

25  confederate flags.  People can join organizations like the

1  Ku Klux Klan or the Nazis and those organizations are guilty

2  of doing very violent things.  But unless you actually -- and

3  even if you pose with them -- let's say you traipse down the

4  street in a Nazi rally with a legal AR-15, you're not going to

5  jail for that.  You can take pictures of that and that's your

6  political statement.  Now, if you act on it, that's another

7  thing.  And I know what the Court is saying that there were

8  these trips to Turkey and these -- but --

9          THE COURT:  In the government's statement, it says

10  here on Twitter, he also extolled the successes of ISIS

11  military advances in the Middle East.  Glorified, martyred

12  them in the name of jihad and called on others to travel to

13  join the Islamic State.

14          MR. SCHWARTZ:  I think it's his state of mind at the

15  time that --

16          THE COURT:  Many of the postings involve graphic

17  depictions of beheadings.

18          MR. SCHWARTZ:  Yes.

19          THE COURT:  In his letter, he tells me he wants to be

20  in Syria to help -- for humanitarian reasons.  Well, that

21  seems to be inconsistent with what he intended back when these

22  events happened.

23          MR. SCHWARTZ:  If somebody retweets something or

24  posts something, maybe even talks glowingly about something

25  that's violent, that does not mean they are going to do it.

U.S. v. NAGI  --  SENTENCING

18

1        THE COURT:  Well, he says here he asked his family

2  members to go with him and "fight".

3        MR. SCHWARTZ:  Well, what was said to family members,

4  I don't know.  He does have a lot of family here today.  They

5  are supportive of him --

6        THE COURT:  His family's wonderful.  And you know,

7  the one I felt sorry for -- and she did a 180, I guess, from a

8  young lady who was, I guess, didn't -- and her father didn't

9  get along very well.  And she has now come a 180.  And her and

10  her father were not exactly a family, let's say -- how do you

11  want to describe it, a loving family?

12        MR. SCHWARTZ:  Right.

13        THE COURT:  It was terrible.

14        MR. SCHWARTZ:  Daughters don't always get along with

15  their fathers.

16        THE COURT:  Well, that's true.  I don't have a

17  daughter and so, I don't know.  But I just -- let me go on one

18  other thing that the government put in its papers.  I think

19  it's kind of interesting.  As he prepared his trip to Turkey,

20  he tried to settle his personal affairs and he told his family

21  members that he wanted to die a warrior's death.  Does that

22  sound like someone that's going over to help people over

23  there?

24        MR. SCHWARTZ:  No.

25        THE COURT:  It sounds like he wants to fight.

U.S. v. NAGI  --  SENTENCING

19

1           MR. SCHWARTZ:  No, it doesn't.  But he thought it was

2    very dangerous to go there.  It's dangerous for people that

3    are fighting.  It's dangerous for people that aren't fighting.

4    And again, he was in a state of mind where -- it wasn't the

5    state of mind he is in now.  It is not the person he is now.

6           He is a clearheaded person that has really had a long

7    time to think about this.  He has had the support of his

8    family.  I think his family was very worried about him for a

9    time.  And you saw there are people that came forward and

10   mentioned to the government the things that he was saying or

11   thinking.  And I think that was out of fear for himself.  But

12   this is not a person that has ever had any ill will towards

13   the United States, any person in the United States.  Maybe he

14   was on the wrong side of an issue --

15          THE COURT:  I suppose that's like someone in

16   World War II not really wanting to harm anybody in the United

17   States but was a Nazi sympathizer.

18          MR. SCHWARTZ:  Well, yeah.  But we don't -- okay, but

19   we did not prosecute them here for that.

20          THE COURT:  Yeah, but if you wanted to go over to

21   Germany during that period of time to fight on behalf of the

22   Nazis, certainly you couldn't say that that's a patriotic

23   American thing to do.

24          MR. SCHWARTZ:  No, no, but the Nazis were in a

25   specific war against the United States.  The Nazis had aligned

1   with Japan, which bombed Pearl Harbor.  Now, the Islamic State

2   is not really an organized -- it is not really a government in

3   that sense.  And it is not the same type of war at all.

4   Again, Mr. Nagi says -- and I'll let you hear from him -- but

5   he believes -- or believed that they were on -- maybe both

6   sides were wrong about a lot of things.

7          I don't think he wants them to be fighting at all.

8   But one side was, in his mind, you have to side -- he had to

9   side with one in his -- so based on what he saw on TV, based

10  on what he knew, based on his religion and politics, he said

11  that he came to the conclusion that the Islamic State is the

12  one that's actually in the right in that particular war.

13         Now, if they started sending people to the

14  United States to harm the United States in some sort of

15  organized fashion, there's no evidence that he would have been

16  any part of that.  There are people that do that.  There are

17  misguided people that think they're doing the Islamic State's

18  bidding by causing harm in the United States.  He's never

19  posted anything about those thoughts.  He's never had those

20  thoughts.  He's never tried anything like that.

21         His whole understanding was, there's this war going

22  on.  There are people being oppressed.  There are people he

23  identifies with in a religious and political way.  And in some

24  way, shape or form, he wants to help them.  And if it's the

25  Islamic State that's the best way to do it, that's what he was

1    going to do.  Misguided, yes; maybe on the wrong side of

2    history, I don't know; but that's what he's being punished for

3    and I don't think the statutory maximum is appropriate for

4    that, Judge.

5          THE COURT:  All right.  Sir, this your opportunity to

6    say anything you'd like to say.

7          THE DEFENDANT:  Yes, sir.  First, I wanted to explain

8    that picture.  That picture was not an Islamic State flag; it

9    was a Hamas flag.  You can tell the difference between an

10   Islamic State flag and Hamas flag or just an Islamic flag.

11   The Islamic State has the Seal of the Prophet in the middle

12   right below the Shahada or the declaration of faith.

13         THE COURT:  Okay.

14         THE DEFENDANT:  That picture was taken before the

15   Islamic State became the caliphate or the Islamic State.  That

16   was -- that picture was taken in the basement, you know, as a

17   showoff.  It wasn't -- it had nothing to do with violence or

18   anything.  Just doing it as a showoff, never posted it on

19   social media, never went off that way.  I had no intentions

20   for that.  And that picture had nothing to do with the Islamic

21   State.

22         THE COURT:  Okay.

23         THE DEFENDANT:  Wrong colors.  Islamic State wears

24   all black.  That's Hamas colors, if anything.  I'm very

25   sincere what I said in that letter, that nothing to do with

1  violence.  If I wanted to, like I said, I was in Yemen.  I had

2  two relatives that already got killed in Yemen by Shiite

3  militia.  If I wanted to stay and fight with Islamic State,

4  they are in Yemen, they are there.  I could have stayed and

5  did it, but I didn't.  That picture had nothing to do with

6  Islamic State and I think the government knows that.  And

7  Lynch, I think he knows that.

8         MR. LYNCH:  Judge, he used it on his pro-ISIS

9  Facebook page.

10         THE DEFENDANT:  That's not an Islamic State flag, is

11  it?

12         MR. LYNCH:  That's a flag of war that's used by

13  Islamic countries, Judge.  It's a black flag.  It is the flag

14  of war.

15         THE COURT:  Okay.  Well, I --

16         MR. LYNCH:  And he used it on --

17         THE COURT:  -- can't tell from the picture.

18         MR. LYNCH:  Right.  And he used it on his pro-ISIS

19  Facebook page to communicate with individuals when he was over

20  in Turkey.  And I'll get a chance to respond, Judge.

21         THE COURT:  Okay.

22         THE DEFENDANT:  And I did it as only just a showoff,

23  nothing else.  Nothing -- I had nothing behind it.  All I used

24  just, you know, my freedom, you know, speech, you know, just

25  to show off, nothing else.

1           THE COURT:  All right.

2           THE DEFENDANT:  I have a small little statement.

3           THE COURT:  You have all day, sir.

4           THE DEFENDANT:  And I don't want to waste any more of

5   your time, so I'm just going to go.

6           THE COURT:  I'm in no hurry.

7           THE DEFENDANT:  First and foremost, I would like to

8   thank you, Your Honor, for giving me the opportunity and the

9   time to explain myself to this Court and it's greatly

10  appreciated.

11          I would like to apologize to Your Honor and to your

12  respectable court for wasting your time and I apologize to my

13  mother and my entire family for all the stress and confusion

14  for the last three years.  I thank them for giving me their

15  full support and to my friends and family members and

16  community.

17          Your Honor, I've been sitting in jail for 35 months,

18  thinking about the unlawful and horrible things that I said on

19  social media.  It was very immature and I'm very embarrassed.

20  I cannot change what I said.  I only have sorrow and regret.

21  Your Honor, you asked why I did what I did.  I'm going to add

22  to the letter I wrote to you, sir and not waste any more of

23  your time.  I want the Court to know I had no intentions of

24  hurting anyone.  All I wanted to do was do my part as a Muslim

25  and help the people of Syria that are suffering from that

U.S. v. NAGI  --  SENTENCING

24

1   sectarian conflict with humanitarian aid and nothing else

2   because all they wanted was freedom.  But I changed my mind

3   and never did it for the fear of my own life; not because I

4   thought I was being surveilled by U.S. and Turkish

5   intelligence.  All I've had is a regret and for -- for what I

6   almost got myself into.  I made a bad decision.  I can never

7   forget and only have myself to blame.

8        I just try to -- I want to put this behind me and you

9   know, get back to my family and be a better son to my mother

10  and be a grandfather to my grandchildren and help my son-in-

11  law with his new company and help him manage his plumbing

12  company and you know, just get on with my life and try to put

13  this behind me.

14       I did what I did.  I'm taking the blame for it, but I

15  never had no intentions to hurt anyone.  I mean, there is a

16  conflict overseas.  There's a lot of things that's going on

17  over there I don't agree with, especially with the Islamic

18  State or Al-Qaeda or any other Islamic group, even Hamas.

19  They attack innocent people.  I don't agree with that.

20       But there is a conflict over there between Sunnis and

21  Shiites.  I'm a Sunni.  Shiites, I mean, they commit a lot of

22  atrocities.  I lost two relatives already.  But if I wanted to

23  really fight, I would have joined in Yemen, but I didn't.  I

24  came back home.  And I struggled to come back home.  And

25  that's it.

U.S. v. NAGI  --  SENTENCING

25

1          THE COURT:  Well, I -- just one thing I'm --

2          THE DEFENDANT:  Sir, may I add?  Most of my tweets or

3    retweets, I'll say probably maybe 70 percent, 75 percent were

4    retweets or copy and paste, sending other tweets -- just

5    spreading the word or just trying to get, you know, more

6    friends on social media.

7          THE COURT:  All right.  Mr. Lynch, I assume that you

8    will take a different position --

9          MR. LYNCH:  Yes, Judge.

10          THE COURT:  -- maybe in the narrative there?

11          MR. LYNCH:  Judge, this case has never been about the

12    defendant's interest in ISIS, his social media tweets.  That

13    is part of it, Judge.  But the fact is, this defendant was

14    prosecuted because of his actions, which demonstrated intent

15    to provide himself as personnel to a foreign terrorist

16    organization, being ISIS.  That's clear.

17          It started back in 2012.  What does he do, Judge?

18    He's ordering things on the internet, on eBay.  He purchased

19    night vision goggles, combat gear, body armor, tactical

20    gloves, iodine pills to purify water and camouflage clothing.

21    All that, Judge.  Then, what does he do?  He reaches out to a

22    convicted member of the Lackawanna Six and seeks advice as to

23    how he's going to survive in the Middle East while he's

24    overseas.  He gets that advice.

25          He makes his first trip in 2012.  And the only thing

1     that causes him to come back, Judge, is he has a serious

2     medical condition.  He comes back, he has surgery.  Following

3     that time, Judge, he again goes on eBay.  He continues to

4     purchase items which appear to be in preparation, not, Judge,

5     to provide humanitarian aid, but to provide himself and

6     personnel -- or gear and personnel on behalf of ISIS.

7            And we know that in 2014 then, Judge, in the

8     beginning of the year, he pledges allegiance to follow Abu

9     Bakr al-Baghdadi.  He is the leader of ISIS, the unquestioned

10    leader of ISIS.  He is the head of the Islamic State.  He's

11    not talking about going to Syria to -- to help out the Syrian

12    children or mothers or anything else.  He's now speaking right

13    directly to the leader of ISIS, pledging his allegiance.

14           As the months progress, Judge, he prepares.  He buys

15    the ticket.  He heads over to Turkey -- he's created his

16    Facebook page, where he is communicating with individuals who

17    are overseas -- and arrives in Istanbul.  Now, if you believe

18    the defendant, at that point he's, oh, I'm out of this.  You

19    know, I can't believe, you know.  My mother tried to stop me

20    before I left.  She pleaded with me to stay.  And I left and

21    I'm on the flight and I changed my mind.

22           But that's not the case, Judge.  That's not what the

23    evidence shows.  That's what he wants you to believe.  But, in

24    fact, when he gets to Turkey, he's now in contact with two

25    individuals through Facebook and he's talking to them.  They

1   are, "the best supporters", which is a clear reference to the

2   best supporters of ISIS.  He is trying to make contact with

3   them.

4           He calls back to his family -- or he texts his family

5   back and he says, they gave me directions on how to get them.

6   But because of Eid, the buses were not running in Turkey.  On

7   that same day, July 28th, 2014 -- now this is six days after

8   he arrived in Turkey -- he tells his friends, I've talked to

9   them personally and would be leaving on Tuesday, July 29th,

10  2014 to meet my friends.

11          Then, the search of his iPad shows that at the end of

12  July 30th and 31st, he's conducting internet activity

13  regarding how to cross from Turkey into Syria.  He's also

14  looked at a recent terrorism attack that occurred in Turkey

15  committed on the U.S. Embassy.

16          He's also looking at the distance between the

17  Iskenderun Airport, which is in the Hatay Province.  It's in

18  the southern part of Turkey, which is right next to Syria.

19  So, he is researching how to get there.  He's looking at

20  flights.  He's looking at hotels in that area.

21          He then later tells his friends and family that he

22  didn't end up going there because he caught up -- got caught

23  up in a situation in Turkey.  And we know that because we have

24  witnesses, Judge, who he told this to.  He thought he was

25  being followed by the Turkish National Police.  He researched

1    the Turkish National Police on his iPad while he was in

2    Turkey.

3          He got rid of the SIM card that went to his cell

4    phone that he had purchased specifically for this trip, a

5    Nokia phone.  And when he comes back to the United States,

6    that SIM card is no longer in the phone.  But what we do have,

7    Judge, in his iPad?  He has taken a photo of that Abu Assad's

8    phone number and it's -- although it's one digit off, we know

9    from other Facebook communications what the number actually

10   was.  He saved that contact.

11         So, here is an individual who he was contacting on

12   Facebook, who he was in contact with when he was in Turkey and

13   who he was communicating with.  He saved that phone number.

14         And he comes back, Judge.  And not only that, now he

15   is planning this third trip to Turkey.  And in that time, he's

16   talking to another family member.  He's showing him photos of

17   ISIS videos where people are being killed, drowned and burned

18   alive.  And he's asking that family member to go with him, not

19   to save people, Judge, but to kill people.

20         The evidence in this case, Judge, is unequivocal.

21   And Mr. Nagi can't say here that this is about humanitarian

22   aid because the evidence shows otherwise.  And that photo,

23   Judge, whether you're standing in front of the Shahada flag or

24   you're standing in front of the ISIS flag, it's an Islamic

25   flag of war and he used this on his pro-ISIS Facebook page.

1   That's how he started communicating with those individuals in

2   Turkey.  This is not a humanitarian photograph, Judge.  That

3   demonstrates something much more.

4         But I also want to go over two things, Judge.  One,

5   the United States is engaged in a war with ISIS.  They may not

6   be a country, Judge, but the United States is engaged in a war

7   with ISIS and so is Europe, because attacks are being

8   committed in the United States.  They're being committed on

9   the European content -- continent and that war is ongoing to

10  this day.

11        So, it is serious that Mr. Nagi tried to join ISIS

12  and that's why there's specifically the law that you can't

13  even attempt to join a group like this.  There are not many

14  other more serious crimes under federal law, Judge, than this

15  one -- murder, obviously harming children -- but this is --

16  this ranks right up there, Judge.  And that's why the maximum

17  sentence in this case of 15 years is appropriate.

18        And I want to close with one other thing, Judge.

19  He's talking about his mental state.  And I just want to note,

20  Judge -- and this was in the report, in paragraph 94, but

21  according to the examination of the defendant, while he was at

22  the Bureau of Prisons, they said, "He was exaggerating his

23  symptoms and feigning them to avoid criminal liability."

24  That's what they said.  That's why they came back said he was

25  competent.  All these hallucinations and everything else, they

1  didn't believe it, Judge.  They monitored him.  They had him

2  there for more than 30 days.  They observed him.  And that's

3  their finding.  And I think that's what he's trying to do

4  today.  He's trying to get you to believe, Judge, that this is

5  not what the government says.  But, in fact, all the evidence

6  in this case shows otherwise, Judge.  He wanted to provide

7  himself.  He wanted to be a fighter on behalf of ISIS.

8          And the tweets, Judge, I mean, there's no reason.  I

9  mean, here's just one from January 14, 2014.  There has to be

10  ten headless bodies on the ground, they're all men.  There's

11  nothing here about women or children or anything.

12          Here's one we were going to have for the jury, but we

13  obviously weren't going to show it.  They're too graphic.  Two

14  severed heads displayed on a wrought iron fence.  That's not

15  humanitarian service there, Judge.

16          Bloody scene featuring a severed head lying next to a

17  headless body, with hands bound behind back and a red and

18  white, black basketball cap with green stars.  That's

19  not humanitarian.

20          Here's another one.  Three individuals wearing black

21  face masks.  And it appears -- Sorry, Judge, these are so

22  small I have to pick up my glasses.  Appears to be in combat

23  gear.  Individual in the center of the photograph carries a

24  rifle and holds a severed head in his hand.

25          Nine severed heads displayed on a blanket.  He

1  tweeted that on May 8th, 2014.  This is just months before his

2  trip, Judge.

3  　　　　Deceased individual lying facedown in the sand.  That

4  was May 22nd, 2014.

5  　　　　Here's a -- just a photo of the ISIS flag being

6  raised in support of a battle they just won.  Appears to be

7  four darkly clothed, masked individuals, two of whom display

8  the index finger gesture.  One of the individuals also holds a

9  severed head in his hand.  That was on May 30th of 2014.

10 　　　　On May -- on June 28th, 2014, there's a man who's

11 been hung.  That photo was not redacted by us.

12 　　　　And then, here, you know, on July 11th, this is now

13 two weeks before he left when he posted a picture of Abu Bakr

14 al-Baghdadi.  But he's also posted a photograph demonstrating

15 the area in which the Islamic State has now reached into

16 Turkey and in parts of Syria -- I'm sorry.  Into parts of

17 Syria.  So, it's showing that the Islamic State is getting

18 larger and that's one week before he left.

19 　　　　Then, on August 20th, this after he's now in Yemen,

20 but that was a reference to the American journalist who was

21 beheaded by ISIS that day.

22 　　　　But, Judge, that's -- again, I think -- I mean,

23 cliches, Judge.  A photo's worth a thousand words.  And I

24 think this photo says a lot; more than that letter.  That's

25 it.

1          MR. SCHWARTZ:  Just very, very briefly, Judge.  The

2    point is not -- the issue is not whether the government can

3    prove that Mr. Nagi sympathized with the Islamic State or

4    wanted to join the Islamic State or tried to join the Islamic

5    State.  He admitted to that.  He's been punished for that and

6    he should be punished for that and that's what we're here for

7    today.

8          There's also no doubt that he said very salacious,

9    ill-advised, horrible, even disgusting things from retweets or

10   posts on social media, but what's -- it's very hard to punish

11   someone for what wasn't truly in their head, what they were

12   truly going to do.  There's no evidence that would say that,

13   if given the chance, he would have engaged himself in the type

14   of violent behavior that was on his social media.  So, I would

15   ask the Court to punish him for what he did, but not

16   necessarily for what he thought.

17          THE COURT:  He's not being punished for what he

18   thought.  He's being punished -- we're here for sentencing for

19   what he did.

20          MR. SCHWARTZ:  I understand, Judge.

21          THE COURT:  Well, that's what you just said.

22          MR. SCHWARTZ:  No.  It's that I'm asking -- that's --

23   no, that's what I'm asking.  I know that's what the Court's

24   going to do, but I think a sentence at that maximum of the

25   statutory range is inappropriate.

1          THE COURT:  You know, as I said in the beginning when

2   I read his letter, I said well, based on what he -- how he

3   appeared in front of me at the time of sentencing and the

4   letter and I know that he had all this family support.  I want

5   to believe all this, but it's very difficult for me to accept

6   this at 100 percent.  It just seems, from what he did, is very

7   different.

8          Now, you can put any kind of a spin on it you want

9   and say that, well, he was bragging, it was on Facebook.  He

10  used the word ill-advised.  I'm not sure what that means.  I'm

11  not sure who advised him, other than decisions that he made by

12  himself.  And as we talked about earlier, he wanted to have a

13  couple members of his family join.  He was very sympathetic

14  toward the Lackawanna Six, it appears, from what I've read and

15  seen and heard.

16         And you know, the daughter made a real strong pitch

17  here in her letter, how she and her father never got along and

18  then -- and she blamed most of it on herself.  She didn't, you

19  know, blame it on him.  She says, I was just growing up and

20  just being very difficult.  And I'm sure that he was obviously

21  concerned about his daughter, appears to be individuals that

22  are very religious.  And that I fully appreciate.

23         But there comes a point in time where you have to be

24  accountable for what you did.  And that's what we're dealing

25  with here.

1          Pursuant to the Sentencing Reform Act of 1984, the

2     judgment of the Court is that the defendant is hereby

3     committed to the custody of the Bureau of Prisons, to be

4     imprisoned for a period of 180 months.  The cost of

5     incarceration fee is waived.  He shall forfeit his interest in

6     the property specifically set forth in section 7 of the

7     agreement and incorporated herein.

8          Upon release, he shall be placed on supervised

9     release for a period of 15 years.  He shall report in person

10    to the probation office in the district in which he's released

11    within 72 hours.  He shall comply with the standard conditions

12    of supervised release adopted by the Court.  He shall not

13    commit another federal, state or local crime.  He shall be

14    prohibited from possessing a firearm or other dangerous device

15    and he shall not possess a controlled substance.

16          Drug testing will not be required.  There's no

17    evidence at all that he used -- has a history of substance

18    abuse problems.  Therefore, that's waived.

19          He shall cooperate in the collection of a DNA sample,

20    as required by the Justice For All Act of 2004.  He shall

21    submit to a search of his person, property, vehicle, place of

22    residence or any other property under his control, based upon

23    reasonable suspicion and permit the confiscation of any

24    evidence or contraband discovered.

25          He shall participate in a mental health treatment

U.S. v. NAGI  --  SENTENCING

35

1   program including mental health evaluation and any treatment

2   recommended.  The probation office will supervise the details

3   of any testing and treatment, including the selection of a

4   provider and schedule.  If inpatient treatment is recommended,

5   it must be approved by the Court, unless the defendant

6   consents.  He is not to leave such treatment until completion

7   or as ordered by the Court.

8          While in treatment or taking any psychotropic

9   medication, he shall abstain from the use of alcohol and be

10   required to contribute to the cost of services rendered.  He

11   does not have the ability to pay a fine.  I will not impose a

12   fine.  However, I am going to impose the mandatory special

13   assessment of $100, which is due immediately.  Payment shall

14   begin under the Bureau of Prisons Inmate Financial

15   Responsibility Program.

16          In determining the sentence, the Court has considered

17   the advisory range and points raised by counsel, the

18   defendant, as well as the government.  In addition, I've

19   carefully considered the factors in 18 U.S.C. 3553(a) and

20   finds the sentence imposed is sufficient, but not greater than

21   necessary to comply with the purposes of sentencing set forth

22   in 18 U.S.C. 3553(a).

23          I have sentenced within the guideline range.  It's

24   the maximum sentence by statute.  I believe the government, in

25   affording the defendant the opportunity to plead, was giving

1   him leniency in that regard.  Had he gone to trial, had he

2   been convicted, he could have been facing a maximum of 35

3   years imprisonment.  So, I think all leniency came from the

4   government, in permitting this plea rather than going to

5   trial.  Obviously, there's risks involved, but I feel that

6   that plea was a fair plea under all the circumstances.

7          I've carefully considered all the information that

8   you've provided, Mr. Schwartz, as well as the points you

9   raised, as well as the points he raised, but I've got to deal

10  with the facts as they occurred when they happened.  And it's

11  very difficult to look at those factors and his actions and to

12  ignore those and make a statement that they are -- well,

13  that's -- he was bragging or he wasn't really sincere, he had

14  no interest in really fighting.  All the evidence seems to

15  indicate otherwise.

16         Now, whether that would have materialized or not, I

17  don't know, but I know that certainly it appears to me that --

18  what his intent was.  And obviously, I don't think we have any

19  enemies much more detrimental to the United States right now

20  than ISIS.

21         You have a right to appeal this sentence, sir, if you

22  feel the Court misapprehended its authority or imposed an

23  illegal sentence.  However, you did waive your right to

24  appeal.  If you feel that waiver is not a valid waiver, you

25  may take that issue before the Second Circuit Court of

U.S. v. NAGI  --  SENTENCING

37

```
 1  Appeals.
 2         MR. LYNCH:  Judge, we move to dismiss Count 2 of the
 3  indictment.
 4         THE COURT:  Motion's granted.  Good luck to you, sir.
 5  Court will be in recess.
 6  (Proceedings concluded.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

38

1               *      *      *      *      *      *      *

2

3               I certify that the foregoing is a

4          correct transcription of the proceedings

5          recorded by me in this matter.

6

7

8

9                              s/ Megan E. Pelka, RPR

10                             Court Reporter,

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25